The hearing before the deputy commissioner in this case was held on 30 January 1991. Prior to said hearing the parties entered into a pre-trial agreement, which is incorporated herein by reference as if fully set forth herein and where they agreed to a number of jurisdictional and other factual stipulations. A Form 21 Agreement for Payment of Compensation was approved by the Industrial Commission on 9 August 1988 and benefits were paid until a Form 24 Application was approved on 5 September 1989. Benefits were later resumed by Order of the deputy commissioner after the hearing but before the Opinion and Award. By subsequent Orders, the parties were allowed to obtain either by deposition or stipulated report, the medical and vocational evidence necessary to complete the record, as well as the lay testimony of two witnesses who were unavailable at the time the case was called for hearing in Nashville. Plaintiff was also allowed the opportunity to submit rebuttal evidence by deposition testimony. More than three and a half years elapsed during the period of time from the hearing to the issuance of the Opinion and Award by the deputy commissioner herein. During said time the record remained open for receipt of new evidence acquired after the date of hearing. The record closed on 18 July 1994 when the final contentions were submitted by the parties. The deposition testimony of the following witnesses was received as evidence in this case:
a) Joseph A. Moylan, M.D.
b) Robert N. Harper, Jr., M.D.
c) Alton R. Anderson, M.D.
d) Josephus T. Bloem, M.D.
e) E.O. Marsigli, M.D.
f) Jerry W. Noble, Ph.D.
g) Katherine L. Wickizer
h) Thomas S. Baldwin, Ph.D.
The deposition testimony of the following lay persons was submitted as evidence by the parties after the hearing:
a) Ruby J. Davis
b) Glenn Cuthrell
c) Lisa Cunningham
d) Marvin Davis (rebuttal)
e) Steven G. Mincher
f) Elmo S. Lewis
g) Larnell C. Davis
Defendants objected to the deposition testimony of Dr. Jerry W. Noble on the ground that this testimony did not represent rebuttal testimony. The objection of defendants is hereby OVERRULED. Plaintiff objected to the deposition testimony of Kenneth Berry and the surveillance video tape produced by Kenneth Berry on the ground that at the time Kenneth Berry was engaging in his surveillance in North Carolina, he had no private investigator's license from North Carolina in effect in violation of Section 74C-2, 74C-16, and 74C-17 of the North Carolina General Statutes. Plaintiff's objection is OVERRULED. Objections raised during deposition testimony are ruled upon according to law and this Opinion and Award.
The undersigned have reviewed the prior Opinion and Award based upon the record of proceedings before Deputy Commissioner Shuping. The appealing parties have shown good ground to reconsider the evidence; and, upon review of the evidence of record herein, the Full Commission REVERSES the Opinion and Award of the deputy commissioner.
Based upon the competent evidence from the record herein, the Full Commission make the following
FINDINGS OF FACT
1. At the time of his 29 April 1988 injury, plaintiff was twenty-seven years old and had completed the tenth grade. During most of his schooling, plaintiff was in special education classes. He later tried to obtain a GED but was unsuccessful due to his limited ability. Plaintiff functions in the borderline range of intelligence and has been classified as functionally illiterate.
2. Plaintiff began work for defendant-employer on 5 April 1988. He was hired to work on the yard and after a short period of time, he was trained to operate the overhead crane. Yard work consisted primarily of loading and unloading steel. Plaintiff's prior work history consisted primarily of manual labor jobs. Defendant-employer is now out of business.
3. At the time of his admittedly compensable injury on 29 April 1988, plaintiff was moving two I-beams weighing approximately seven tons when the cable came loose, causing the two steel beams to fall on top of plaintiff. Plaintiff sustained life-threatening internal injuries, including collapsed lungs, rupture of the small intestine and a lacerated liver. Plaintiff also sustained multiple fractures and other injuries to his right and left upper extremities and his right and left lower extremities. Plaintiff was transported to Duke University Medical Center by Lifeflight where he underwent immediate surgery. He remained hospitalized for approximately three months. Plaintiff's treating physician for his internal and abdominal injuries while at Duke University was Dr. Joseph Moylan, a general surgeon. Dr. Hardaker at Duke University treated plaintiff's multiple fractures to his upper and lower extremities. Plaintiff underwent two abdominal surgeries. During his second surgery on 20 May 1988, a large number of serosal tears were still present involving significant portions of the small and large intestines. It was not possible to repair all of the tears. Additionally, a large amount of very dense adhesions were found in plaintiff's abdominal area and scarring was found along his abdominal wall. Plaintiff was discharged from the hospital on 3 July 1988. His discharge diagnosis was: (1) "Duo denal rupture, s/p crush injury; (2) hepatic lacerations; (3) retroperitoneal hematoma; (4) right distal fibula fracture".
4. After his release from the hospital plaintiff received follow-up care with Dr. Moylan on 20 July 1988, 22 August 1988, and 28 September 1988. Plaintiff continued to report abdominal pain and pain in his right ankle. On 28 September 1988, plaintiff was discharged from Dr. Moylan's care. At said time, due to complaints of pain in his right ankle, he was referred by Dr. Moylan to an orthopedic surgeon for follow-up on these complaints. On 6 October 1988, Dr. Moylan, in a letter by his physician's assistant, Kevin Fitzpatrick, opined that plaintiff was free to return to work. Dr. Moylan saw plaintiff for a final disability evaluation on 18 December 1989 and thereafter at the request of defendant-carrier on 24 February 1992 and 15 June 1992. In a letter dated 3 August 1992, Dr. Moylan opined that plaintiff had reached maximum medical improvement, that the only permanent partial impairment he had sustained was the scarring of his abdominal wall and the presence of intra-abdominal adhesions and that plaintiff could do light duty work. On 24 July 1992, Dr. Moylan completed a physical capacities form indicating what restrictions or limitations plaintiff would have as to standing, walking, sitting, driving, lifting, repetitive use of hands, balance, climbing, bending, squatting, twisting, reaching, etc. The report also proported to take into account use of medications and environmental factors. No weight or credibility is accorded this physical capacities evaluation due to Dr. Moylan's admission that he had not tested plaintiff in any of these areas and that the opinions expressed on this form were based solely upon listening to plaintiff's abdomen through a stethoscope and palpating plaintiff's abdomen.
5. Although he has seen numerous other physicians on a few occasions for examinations, evaluations, and diagnoses, Dr. Alton Anderson is the only physician who has continually and regularly treated plaintiff since July 1988. Dr. Anderson is board certified in Family Practice and more than fifty percent of his practice is devoted to internal medicine. Dr. Anderson was also plaintiff's physician from 1984 to 1988, a period of four years before the accident in question. During his July, October and November 1988 visits to Dr. Anderson, plaintiff reported pain in his ankles, muscle spasms, abdominal pain, and back pain. Dr. Anderson re-started plaintiff on physical therapy. Physical therapy had been tried previously, but halted due to the intensity of the pain in plaintiff's stomach during the exercises. During the 29 November 1988 visit plaintiff had right leg and ankle swelling. Dr. Anderson referred plaintiff to Dr. Raven L. DeLoatch, an internist in Jackson for a second opinion.
6. Beginning in February 1989, plaintiff began to experience symptoms of rectal drainage which has presently not resolved. In May 1989 he had an episode of chest pains necessitating a referral to a cardiologist. In September 1989, plaintiff experienced severe cramping and abdominal pain for a continuous period of about 24 hours after trying to mow grass; and in April 1989, it was discovered that plaintiff had a meniscal tear in his right knee which needed surgical repair. Plaintiff's symptoms of chronic abdominal pain, leg pain, knee pain and fecal incontinence have been ongoing. The best indicator of the severity of plaintiff's pain and his fecal incontinence is plaintiff's own reports. Dr. Anderson's objective examinations support plaintiff's subjective complaints of continuing chronic pain and tenderness in his abdominal area and pain involving his extremities.
7. Dr. Anderson opined that as a result of his multiple abdominal trauma and other physical limitations arising from the 29 April 1988 injury, plaintiff is permanently and totally disabled and would be exposed to a substantial risk of reinjury if he engages in work-related physical activities over more than short intervals of time. In reaching this opinion he considered the fact that prior to his injury plaintiff was in excellent physical condition, was very active, did a lot of physical work, and even had three or four jobs at one time. After the accident, plaintiff has either been bed-bound or in pain for days after attempting ordinary events such as cutting the grass or riding a bicycle. Plaintiff had never previously been hospitalized or missed time from work, but due to the trauma from his abdominal injuries, plaintiff's GI system presently is in shambles. He suffers from constant pain and diarrhea which causes fecal incontinence. He cannot stand or sit for any prolonged length of time, his medications cause drowsiness thus eliminating work around machinery; and physical therapy aggravates his condition since it involves stretching the adhesions from his surgery which produces increased pain. In addition, there is evidence that his abdominal condition is worsening.
8. Dr. Anderson referred plaintiff to Dr. Raven L. DeLoatch, a board certified internist to independently evaluate plaintiff's internal injuries. Dr. DeLoatch evaluated plaintiff on 13 December 1988, 10 January 1989 and 30 March 1990. He performed a disability exam to determine the degree of plaintiff's disability. Dr. DeLoatch's diagnosed severe internal injuries, status post, and paresthesia or numbness of the legs. In his findings, he also noted multiple gastrointestinal complaints including nausea, vomiting, bloating, watery diarrhea, and pain and tenderness in the abdominal area. He opined that plaintiff is totally and permanently disabled because he is in chronic pain, has chronic diarrhea, and has nausea and vomiting.
9. Plaintiff was examined by two orthopedic surgeons, Dr. E.O. Marsigli and Dr. Josephus T. Bloem. Dr. Marsigli is plaintiff's treating orthopedist and is board certified in orthopedic surgery. At the time of his deposition on 19 August 1991, Dr. Marsigli had treated plaintiff on several occasions during the period from 29 March 1989 through September, 1989. Plaintiff presented with complaints of right knee pain and weakness, popping in the right knee, and right knee give-away when walking since his April 1988 work-related injury. Objective testing and examination confirmed a probable internal derangement of the right knee and a probable tear of the medial meniscus. This was subsequently confirmed by x-ray. Arthroscopic surgery was recommended in October 1989, but defendant-carrier refused to authorize such surgery until February 1992. Dr. Marsigli performed surgery on plaintiff's right knee on 4 February 1992 and was surprised to find that the cruciate ligament was completely incompetent and torn. His post-operative diagnosis was internal derangement of the right knee with an almost complete tear of the cruciate ligament, and a partial tear of the anterior portion of the medial meniscus.
10. Dr. Marsigli opined and the undersigned find that plaintiff's right knee problems and resulting surgery were caused by the injuries he sustained in the 29 April 1988 admittedly compensable work-related injury.
11. Defendants sent plaintiff for a second opinion to Dr. Josephus T. Bloem, an orthopedic surgeon who is not board certified, but is board eligible. Dr. Bloem evaluated plaintiff during his one visit of 27 July 1989 to offer an opinion concerning the findings and recommendations of Dr. Marsigli. He verified to defendants that he saw evidence of a meniscal tear in plaintiff's right knee on the MRI and he concurred with Dr. Marsigli's recommendation of arthroscopic surgery. Dr. Bloem also opined that it is reasonable to believe that plaintiff's meniscus injury had been present but undetected by the physicians who treated him at Duke University because a problem of this nature is usually not apparent until one resumes normal use of the knee. He further opined that the work-related accident likely caused this injury.
12. Based upon this one evaluation and prior to the time plaintiff had undergone the knee surgery he recommended, Dr. Bloem assigned plaintiff a ten percent (10%) permanent partial impairment to his right ankle, but declined to offer a rating for the right knee. He also concluded that plaintiff could return to work immediately.
13. At the request of defendants, Dr. Robert N. Harper, Jr., who is board certified in the gastroenterology, evaluated the effect of plaintiff's abdominal condition on his employability on 9 October 1992 and again on 9 February 1993. Plaintiff's medical records from Dr. Moylan at Duke University were furnished to Dr. Harper for the second visit. Medical records from plaintiff's doctors were not provided.
14. In Dr. Harper's opinion, plaintiff probably has pain related to his injury, the extent of which is difficult to ascertain, but there is very little evidence for any obstruction, infection, functional disability, lack of absorption in the GI tract or difficulty in digestion. Dr. Harper suggested that plaintiff be evaluated for his pain and undergo rehabilitation. He believed plaintiff could assume any form of employment with support and rehabilitation.
15. Dr. Jerry Noble, an expert in the field of clinical psychology including the area of vocational assessments, conducted a clinical interview, a psychological assessment, and psychological testing on plaintiff and found that plaintiff had a verbal IQ of 77, a performance IQ of 82, and a full-scale IQ of 77. An IQ of 77 represents borderline intellectual functioning. Only two percent (2%) of the U.S. population is below this level. Dr. Noble also found that plaintiff had problems in the following areas: recall; breadth of ideas; concepts and experiences; concentration; ability to perform arithmetic calculations; social adjustment; abstract reasoning; alertness to visual details; visual motor concept formation; and visual-motor speed. He made four psychological diagnoses of the plaintiff: (1) post-traumatic stress disorder; (2) multiple simple phobias; (3) probable post-concussion syndrome; and (4) probable dysthmia, which is an on-going depressive condition. Dr. Noble opined that these diagnoses taken together would support a conclusion that plaintiff has a severe mental disability and that this severe mental disability was caused by plaintiff's accident at Howell Steel on 29 April 1988.
16. Dr. Noble opined that plaintiff is permanently and totally disabled and that his prognosis for return to competitive employment is "dismal" based on plaintiff's lack of transferable skills, significant physical disabilities and severe psychological disorders, which tend to add to and compound the disability factors. He further concluded that plaintiff's intellectual limitations allow him limited insight into his psychological problems and that it is hard to foresee a successful outcome of any psychological treatment intervention, even over a long period of time.
17. Dr. Noble further opined that his psychological disorders alone would prevent plaintiff from being actively engaged in competitive employment because his conditions are chronic and severe. Plaintiff's ongoing significant pain is expected to worsen his anxiety and depressive symptoms and his anxiety and depression will worsen his pain.
18. Dr. Thomas Baldwin, a vocational rehabilitation expert, also conducted a psychological and vocational assessment of plaintiff. He reviewed the psychological test results of Dr. Jerry Noble and the medical records from Duke University and Dr. Anderson. Additionally, he administered the Wide Range Achievement Test-Revised to plaintiff and interviewed him. Dr. Baldwin opined that plaintiff is not employable. He considered a number of factors including plaintiff's physical limitations, his psychological disorders, his level of intelligence (borderline range of mental retardation), his lack of cognitive and transferable skills, his ongoing pain, his self-assessment concerning his ability, and concluded that plaintiff is not a good candidate for retraining. Dr. Baldwin also concluded, "A person with those restrictions would not be able to perform successfully in the national economy". Dr. Baldwin supports the opinion of Dr. Noble that plaintiff's psychological disability alone would prevent him from returning to competitive employment. Likewise, Dr. Baldwin opined that the combination of physical and psychological problems would render plaintiff unable to engage in competitive employment and that there are no jobs in the northeastern part of North Carolina where plaintiff lives, which plaintiff can do.
19. Defendants offered vocational testimony concerning plaintiff's employability through Katherine L. Wickizer, a certified vocational evaluator and rehabilitation counselor that defendants retained to initiate a job search for plaintiff. She first interviewed plaintiff on 10 April 1992. Plaintiff was subsequently tested and a job search was initiated beginning in January, 1993. Defendant-carrier instructed her to rely upon the physical capacities form signed by Dr. Moylan as the basis for her decision about suitable jobs. Plaintiff applied at ten to twelve places but received no job offer. Katherine Wickizer's opinion that it is highly likely that plaintiff could have obtained a job at Perdue Chicken Hatchery and the Daily Herald Newspaper but for his attitude, is not supported by the competent evidence. She was not present at the one interview plaintiff was given at Perdue and her testimony concerning plaintiff's attitude was based in part on a disagreement she had with plaintiff. She encouraged plaintiff not to fill out the medical portion of job applications and not to reveal the extent of his physical limitations and bodily injuries to prospective employers, and plaintiff did not believe this was right.
20. Katherine Wickizer took plaintiff on job searches without analyzing the specific job duties involved or the educational requirements for some of the jobs even though her testing had revealed that plaintiff was functionally illiterate. As for the job at The Daily Herald, she admitted that she and plaintiff had only stopped by to pick up an application.
21. The expert testimony of Dr. Jerry W. Noble and Dr. Thomas S. Baldwin is accorded greater weight and credibility than that of Katherine Wickizer concerning plaintiff's employability because of their superior level of expertise and training and the fact that they considered plaintiff's physical and psychological conditions as well as vocational factors in reaching their opinions.
22. Greater weight is given to the opinion of Dr. Anderson concerning the extent of plaintiff's physical disability over that of other physicians who have expressed a different opinion because he is plaintiff's primary treating physician, and is the only physician who has observed and treated plaintiff's condition continuously since his discharge from the hospital. He is in the best position to know the total effect of plaintiff's multiple injuries on his current level of physical functioning. Also, Dr. Anderson's opinion concerning plaintiff's disability is supported by Dr. DeLoatch, a board certified internist.
23. As a result of his physical impairments, his psychological or mental impairments, and/or a combination of both which were caused by his work-related injury of 29 April 1988, plaintiff is incapable of earning wages in the same employment or any other employment. Plaintiff's incapacity to earn wages is total and permanent.
24. Plaintiff will require future medical treatment and maintenance. Plaintiff is entitled to payment by defendants for all medical (including psychological) treatments, examinations and evaluations (past and future) to the extent that the same are reasonably designed to tend to effect a cure, give relief and/or will tend to lessen his period of disability.
25. There was no competent evidence to support the Industrial Commission's approval of the Form 24 Application to Stop Payment of Benefits to the Plaintiff on 5 September 1989.
26. Limited weight and credibility is accorded the testimony and videotape of Kenneth Berry, a surveillance agent hired by defendants due to the poor quality of the videotape. Also, Kenneth Berry is not accepted as an expert witness. No weight or credibility is given to his conclusions or opinions.
27. Plaintiff is not employable due to his physical limitations, psychological impairments, borderline mental retardation, lack of cognitive skills, lack of transferable skills and limited ability to be restrained. There are no jobs in the locality where plaintiff resides that plaintiff can do, and due to his limitations it would be futile for him to seek employment.
28. Plaintiff's average weekly wage of $282.63 yields a compensation rate of $188.43.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission enter the following
CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment on 29 April 1988 when two steel I-beams weighing approximately seven tons fell on top of him while working for defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven by the greater weight of the evidence that as a result of the life-threatening injuries he suffered on 29 April 1988 he is physically and mentally incapable of working and earning wages in the same or any other employment and that even if he is capable of some work it would be futile to seek employment because of his pre-existing borderline range of mental retardation, his lack of cognitive and transferable skills, his inability to read or write, his lack of education and his incapacity to benefit from retraining in combination with his physical and mental impairments. Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454(1993).
3. Plaintiff has proven by the greater weight of the evidence that there are no jobs in his locality that he is able to do as a result of his physical and mental disability caused by his compensable injury and his pre-existing limitations.
4. Plaintiff is entitled to permanent and total disability benefits. N.C. Gen. Stat. § 97-29. McKenzie v. McCarterElectrical Co., 86 N.C. App. 619(1987). An employee can prove he is permanently and totally disabled in one of three ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work-related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment. Proof that the employee falls into any one of the above categories is sufficient. Russell v. Lowe's ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454(1993); Peoples v.Cone Mills Corp., 316 N.C. 426, 342 S.E.2d 798 (1986).
5. Plaintiff is entitled to continuing compensation for all reasonable and necessary medical expenses (including psychological) arising from his compensable injury during his lifetime. N.C. Gen. Stat. § 97-29.
6. There were insufficient grounds to support approval of the Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation on 5 September 1989 and said approval should be vacated.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of Law, the Full Commission enter the following
AWARD
1. Subject to counsel fees, defendants shall pay to plaintiff compensation for total disability at the rate of $188.43 per week from the date of injury on 29 April 1988 and continuing for the remainder of his lifetime or until he sustains a change of condition. Any compensation which has accrued shall be paid in one lump sum. Defendants shall be given credit for all compensation previously paid.
2. Defendants shall pay all of plaintiff's past and future, reasonable and necessary medical expenses (including psychological) arising from his compensable injury, when bills for same have been submitted through defendant-carrier to the Industrial Commission for approval.
3. A reasonable attorney's fee of twenty-five percent (25%) of the accrued compensation due plaintiff herein is approved for plaintiff's counsel and thereafter, plaintiff's counsel shall receive every fourth check. Said attorney's fee shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs due this Commission.
* * * * * * * * * * *
ORDER
IT IS HEREBY ORDERED that the Industrial Commission's approval of the Form 24 Application of Employer or Insurance Carrier to Stop Payment of Compensation is VACATED.
 S/ _____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _____________ JAMES J. BOOKER COMMISSIONER
S/ _____________ DIANNE C. SELLERS COMMISSIONER
BSB:md